❒ Original ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
4053 A N. 6th Street Upper, Milwaukee Wisconsin, 53212 and a silver Honda Accord bearing Wisconsin license plate AXX6320

Case No. 26-823M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachments A1 and A2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 1/27/2026 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 1/13/2026 @ 1:30 p.m.

[signature: Nancy Joseph]
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A1

**Property to be searched**

The property to be searched is the premises located at **4053A N. 6th Street Upper, Milwaukee, Wisconsin** ("**SUBJECT PREMISE 1**"), a multi-family residence with tan siding and white trim, and a light brown roof. The numbers "4053A" are fixed to the east side of the southeast porch column on the front porch. The front door of the residence faces east. The search to include all associated common spaces, basement, garage, outbuildings, and electronic devices.





**ATTACHMENT A2**

**Property to be searched**

The property to be searched is a silver Honda Accord bearing Wisconsin license plates AZZ6320 **("SUBJECT PREMISE 2").**





## ATTACHMENT B

**Property to be Seized**

1. Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances;

2. In particular, any machine, equipment or tools used to manufacture or bind books, or to impregnate books with controlled substances in any manner including dissolving the controlled substances and/or coating, painting or soaking book pages;

3. Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

4. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, cryptocurrency, jewelry, or other items obtained with the proceeds from drug trafficking activities;

5. Records and information relating to the purchase, sale, shipment, handling, importation, or distribution of cocaine and fentanyl, and any other controlled substance, including but not limited to bills, invoices, receipts, shipping documents, purchase orders, letters, notes, and order forms, lists of contacts and any identifying information; photographs, videos, or other media storage connected to controlled substances; types, amounts, and prices of controlled substances purchased/sold; any information related to sources or purchasers of controlled substances (including names, addresses, phone numbers, or any other identifying information);

6. Firearms, ammunition, cases, or firearm accessories and documents showing firearm possession or ownership, to include but not limited to CCW permit and firearm purchase/acquisition documents;

7. Indicia of unlawful possession, use, or distribution of controlled substances, including but not limited to paraphernalia and evidence known to be associated with drug trafficking and/or drug possession;

8. USPS packaging materials, or other documents and items related to shipping or mailing;

9. Evidence of recent cash expenditures;

10. Bank account records, loan documents, wire transfer records, money order receipts, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

11. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

12. Identification and location of assets obtained with drug proceeds;

13. All records, items, and documents reflecting travel for the purpose of participating in the aforementioned drug trafficking organization, including but not limited passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and

restaurant receipts, canceled checks, maps, gas station receipts, store receipts, credit card receipts, restaurant receipts, maps, and records of long distance calls reflecting travel;

14. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

15. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

16. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances;

17. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

18. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

19. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

20. All records and information relating to violations of Title 21, United States Code, Sections 841(a)(1) (manufacture, distribution, and possession with intent to distribute a controlled substance), 846 (conspiracy to manufacture, distribute, and possess with intent to distribute a controlled substance), and 843(b) (unlawful use of a communication facility, including the mails,

to facilitate the distribution of a controlled substance), involving Antonio SMITH, Destany WHIDBEE, Krystyna ROGERS, Latrese ROGERS, and others, known or unknown, including but not limited to:

a. Records and information relating to the existence, scope, overt acts, and members of a drug conspiracy.

b. Records and information relating to the possession, custody, or control of the relevant electronic devices and accounts, including accounts with electronic communication service provides and remote computing services; and

c. Records and information relating to the use of the U.S. Postal Service or other parcel, mailing, shipping, or delivery services;

d. Records and information relating to the identity or location of the suspects;

e. Records and information relating to Internet Protocol addresses;

f. Evidence showing custody, control, ownership, or possession of SUBJECT PREMISE 1 or SUBJECT PREMISE 2

For any computer, cell phone, tablet, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, for purposes of this Attachment B, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

n. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "COMPUTER" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or

storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term “storage medium” includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of the subject premises described in Attachment A (Attachment A1 or A2), law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**’s to the fingerprint scanner of the devices; (2) hold the devices found in front of the face of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**’s and activate the facial recognition feature; and/or (3) hold the devices found in front of the face of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**’s and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

4053 A N. 6th Street Upper, Milwaukee Wisconsin, 53212 and a silver Honda Accord bearing Wisconsin license plate AXX6320

Case No. 26-823M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A1 and A2,

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1)<br>21 U.S.C. § 843(b)<br>21 U.S.C. § 846 | Distribution of a controlled substance, unlawful use of a communication facility, and conspiracy. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Tyler Fink Digitally signed by Tyler Fink Date: 2026.01.12 08:51:48 -06'00'

*Applicant's signature*

Tyler Fink, Postal Inspector

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1/13/2026

Nancy Joseph

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Tyler Fink, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS"). I have been employed as a full-time law enforcement officer since June 2014.

2. The USPIS is the primary investigative arm of the United States Postal Service ("USPS") and is charged under Title 18, United States Code, Section 3061 with the enforcement of laws governing the use and movement of the United States Mail, including but not limited to, the misuse and fraudulent schemes involving the mail, and crimes relating to mail fraud, identity theft, and narcotics trafficking involving the U.S. Mail.

3. I am currently assigned to the USPIS Milwaukee Office, Multi-function team, as well as the High Intensity Drug Trafficking Area ("HIDTA") Interdiction Task Force. The USPIS Milwaukee Office investigates USPS customers involving narcotics, prohibited mailings, controlled substances, prescription medications, and other matters related to the Postal Service. I have intercepted numerous parcels, which were found to contain narcotics, firearms, or proceeds of narcotics trafficking and other evidence of criminal activity.

4. I hold a Bachelor of Science degree in Mechanical Engineering from the University of Missouri – St. Louis. In 2014, I completed the Peace Officer Standards and Training certification at the St. Louis County and Municipal Police Academy while employed as a City of Creve Coeur Police Officer. While working as a Police Officer, I received extensive training in narcotics investigations. In 2017, I graduated from the United States Postal Inspection Service ("USPIS") Basic Inspector Training program. I received advanced training by the USPIS in the

investigation of controlled substances and proceeds being transported through the United States mail.

5. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (manufacture, distribute, and possess with intent to distribute a controlled substance, use of a communication facility to commit a felony drug crime, and conspiracy to do the same), and other related offenses. More specifically, my training and experience includes the following:

a. I have used informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from drug traffickers, and have made undercover purchases of controlled substances;

c. I have participated in several search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug traffickers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g. I know that drug traffickers commonly have in their possession, and at their residences and other storage locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets to avoid scrutiny from law enforcement officials;

i. I know large-scale drug traffickers often purchase or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

j. I know large-scale drug traffickers maintain on-hand large amounts of U.S. currency to maintain and finance their ongoing drug business;

k. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, and receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. I also know that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them;

l. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, storage facilities, or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

m. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses, or other locations over which they maintain dominion and control;

n. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record or store the information described in the items above, as well as conduct drug trafficking activities;

o. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

p. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization; and

q. I know drug traffickers take (or cause to be taken) and maintain photographs of themselves, their associates, their property, and their drugs.

6. In addition, during the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residence. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7. I have been the affiant on over 100 warrants in federal court. Based on my training, personal experience, on the job training, and working with other USPIS Postal Inspectors and HIDTA drug task force officers, I know narcotics, drugs, paraphernalia, controlled substances, firearms, prescription medications, and moneys associated with the sale of narcotics, drugs, and controlled substances are sent through the USPS system, and I am familiar with many of the methods used by individuals who attempt to use the USPS to illegally distribute controlled substances and prescription medications.

8. This affidavit is based upon my personal knowledge, training, and experience, and on information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit

is also based upon police reports, official records, witness statements, recorded statements, surveillance video, and public records which I consider to be reliable as set forth herein.

## PREMISES WARRANTS

9. For the reasons discussed herein, there is probable cause to believe that located at and in the following properties (collectively, "**SUBJECT PREMISES**"), more fully described in Attachments A1 and A2, (collectively, "Attachment A"), are items that constitute evidence of drug trafficking, including violations of Title 21, United States Code, Sections 841(a)(1) (manufacture, distribution, and possession with intent to distribute a controlled substance), 846 (conspiracy to manufacture, distribute, and possess with intent to distribute a controlled substance), and 843(b) (unlawful use of a communication facility, including the mails, to facilitate the distribution of a controlled substance) by Antonio SMITH, Destany WHIDBEE, Krystyna ROGERS, Latrese ROGERS, and others:

A1. 4053A N. 6th Street Upper, Milwaukee, Wisconsin 53212 ("**SUBJECT PREMISE 1**")

A2. A silver Honda Accord bearing Wisconsin license plate AXX6320 ("**SUBJECT PREMISE 2**")

10. I further submit that evidence relating to this crime, more particularly described in Attachment B, can be found in the **SUBJECT PREMISES**, more particularly described in Attachment A. This affidavit is intended to show only that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Background

11. Beginning December 2025, the USPIS, the City of Brookfield Police Department, and the Drug Enforcement Administration (DEA") have been investigating Antonio SMITH ("SMITH"), Destany WHIDBEE ("WHIDBEE"), Krystyna ROGERS ("K. ROGERS"), and Latrese ROGERS ("L. ROGERS"), who are all based out of Wisconsin. In summary, the investigation revealed WHIDBEE, K. ROGERS, and L. ROGERS assist each other in mailing distribution quantities of drug laden parcels from the Eastern District of Wisconsin into several Wisconsin Department of Corrections ("DOC") prisons in both the Eastern and Western Districts of Wisconsin. A review of jail calls indicated SMITH advises to his co-conspirators above which of his customers to address the drug laden parcels too.

12. This investigation began in December 2025 after Investigators with Wisconsin DOC advised case agents that they believed SMITH (DOB: XX/XX/1982), inmate number 275561, was suspected of being responsible for coordinating shipments of suspected controlled substances to DOC locations. DOC Investigators said multiple USPS parcels appearing to be linked to SMITH and his known associates were delivered to multiple Wisconsin DOC locations. The DOC investigators detained the parcels once they were delivered to the prisons.

13. Based on my training and experience, I know that drug traffickers will sometimes use USPS's Ground Advantage and Priority Mail services. Based on my training and experience with the USPIS, I know drug traffickers use Ground Advantage and Priority Mail delivery service because of its reliability and the ability to track the article's progress to the intended delivery point. In my training and experience, traffickers will often use fictitious names, phone numbers, or

addresses as well as incomplete names and addresses in an attempt to hide their trafficking efforts from law enforcement.

14. I also know, based on my training and experience, I am aware Milwaukee can be a trans-shipment point for controlled substances. As such, controlled substances are sometimes transported from Milwaukee via the USPS, to prison inmates by co-conspirators who are not currently incarcerated.

15. During the investigation, case agents have located eight suspicious parcels consistent with drug parcels that were mailed from Milwaukee to Wisconsin DOC prisons.

16. In total, this drug trafficking organization ("DTO") used two different sender names for the suspected drug laden parcels. Post Office surveillance video has captured three different subjects shipping approximately eight of these parcels. Surveillance video from the relevant Post Office showed these parcels were shipped by WHIDBEE, K. ROGERS, and L. ROGERS.

17. Of these eight parcels, case agents seized and searched all eight of the suspicious parcels pursuant to search warrants. All eight parcels contained various books. Books from seven of the eight parcels seized field tested positive for various drugs including spice (synthetic cannabinoid), cocaine, methamphetamine and heroin. Field testing from the eighth parcel seized all came back as inconclusive.

**Subjects Involved**

18. SMITH is currently an inmate at the Columbia Correctional Institution, located at 2925 Columbia Drive, Portage, Wisconsin.

19. In 2017, SMITH plead guilty to First Degree Intentional Homicide. *See State of Wisconsin v. Antonio Marques Smith*, Milwaukee County Court Case 2015CF003367.

20. In 2017, SMITH plead guilty to Conspiracy to Commit 1st-Degree Intentional Homicide. *See State of Wisconsin v. Antonio Marques Smith*, Milwaukee County Court Case 2015CF004868.

21. In 2017, SMITH plead guilty to First Degree Intentional Homicide. *See State of Wisconsin v. Antonio Marques Smith*, Milwaukee County Court Case 2016CF001004.

22. SMITH is currently serving a sentence of life in prison due to the above convictions.

23. A review of jail calls indicated SMITH first worked with WHIDBEE to coordinate creating USPS shipping labels for six suspected drug laden USPS parcels (as described below). WHIDBEE then shipped these parcels from the Milwaukee Main Post Office, located at 345 W. Saint Paul Avenue, Milwaukee, Wisconsin 53203.

24. After several of the parcels did not get delivered to SMITH's intended recipients, SMITH then started working with K. ROGERS and L. ROGERS to coordinate the shipment of three additional suspected drug laden USPS parcels (as described below).

25. K. ROGERS, a.k.a. "Krys", is a person who obtains and ships controlled substances for further distribution for SMITH. K. ROGERS resides at 4053A N. 6th Street Upper, Milwaukee, Wisconsin 53212 ("**SUBJECT PREMISE 1**"), which has been confirmed by investigation, surveillance, and review of USPS business records. Moreover, case agents have observed K. ROGERS and L. ROGERS exiting from the rear of the residence in the area of the rear door. K. ROGERS has registered the address 4053A N. 6th Street Upper ("**SUBJECT PREMISE 1**") with the Wisconsin Department of Transportation ("DOT").

### Seizure of SUBJECT PARCELS 2, 3, and 6

26. On December 22, 2025, I received SUBJECT PARCELS 2, 3, and 6 after they were forwarded to me, unopened, by the various Wisconsin DOC locations. The parcels can be described as follows:

a. USPS Ground Advantage parcel 9434630109355101482381 ("SUBJECT PARCEL 2"). SUBJECT PARCEL 2 was a USPS parcel weighing approximately 7 lbs. 1 oz. The shipping label for SUBJECT PARCEL 2 indicated it was from "DIAMONDINROUGHCOMMUNITIES DESTANY WHIDBEE 5102 N LOVERS LANE RD APT 7 MILWAUKEE WI 53225-3729". The sender listed an email address of "destanywhidbee1209@gmail.com". SUBJECT PARCEL 2 bore a typewritten label addressed to "ANTONIO SMITH 2925 COLUMBIA DR PORTAGE WI 53901-9485". Records for SUBJECT PARCEL 2 did not show a postmark location. The shipping label was created on December 14, 2025 at approximately 2:04 a.m. The postage was paid through Click-N-Ship and was $5.85. SUBJECT PARCEL 2 was delivered on December 17, 2025 at approximately 9:48 a.m.

b. USPS Ground Advantage parcel 9434630109355101477530 ("SUBJECT PARCEL 3"). SUBJECT PARCEL 3 was a USPS parcel weighing approximately 5 lbs. 1 oz. The shipping label for SUBJECT PARCEL 3 indicated it was from "DIAMONDINROUGHCOMMUNITIES DESTANY WHIDBEE 5102 N LOVERS LANE RD APT 7 MILWAUKEE WI 53225-3729". The sender listed an email address of

"destanywhidbee1209@gmail.com". SUBJECT PARCEL 3 bore a typewritten label addressed to "ADRIAN IRBY 2000 PROGRESS DR NEW LISBON WI 53950-1530". Records for SUBJECT PARCEL 3 did not show a postmark location. The shipping label was created on December 14, 2025 at approximately 12:17 a.m. The postage was paid through Click-N-Ship and was $6.07. SUBJECT PARCEL 3 was delivered on December 17, 2025 at approximately 8:36 a.m.

c. USPS Ground Advantage parcel 9434630109355101482510 ("SUBJECT PARCEL 6"). SUBJECT PARCEL 6 was a USPS parcel weighing approximately 6 lbs. 0 oz. The shipping label for SUBJECT PARCEL 6 indicated it was from "DESTANY WHIDBEE 5102 N LOVERS LANE RD APT 7 MILWAUKEE WI 53225-3729". The sender listed an email address of "destanywhidbee1209@gmail.com". SUBJECT PARCEL 6 bore a typewritten label addressed to "HARLEY SCHRANK PO BOX 200 FOX LAKE WI 53933-0200". Records for SUBJECT PARCEL 6 did not show a postmark location. The shipping label was created on December 14, 2025 at approximately 2:15 a.m. The postage was paid through Click-N-Ship and was $5.85. SUBJECT PARCEL 6 was delivered on December 17, 2025 at approximately 9:33 a.m.

27. On December 22, 2025, I applied for and received federal search warrants for SUBJECT PARCEL 2, SUBJECT PARCEL 3, and SUBJECT PARCEL 6. The search warrants were issued by U.S. Magistrate Judge William Duffin in the Eastern District of Wisconsin.

28. Upon executing the search warrant on SUBJECT PARCEL 2, on December 22, 2025, case agents discovered the following books: The 99 Names of Allah, Nonprofit Management, Merriam-Webster's Dictionary and Thesaurus, and The Holy Qur'an. The pages in The 99 Names of Allah book did not appear to be produced by the original manufacturer. It appeared as if the pages were printed on normal computer paper and bound into the book. The gross weight of The 99 Names of Allah was 445 grams, and the Qur'an was 775 grams. Using an Ionscan 600, Milwaukee County Sheriff's Office Deputy Ethan Stoudt field tested page 24 of The 99 Names of Allah which field tested positive for the presence of cocaine/oxycodone and Spice-H. Deputy Stoudt also field tested page 28 of the Qur'an which field tested positive for the presence of methamphetamine.

29. Upon executing the search warrant on SUBJECT PARCEL 3, on December 22, 2025, case agents discovered the following books: King James Bible, Large Print Word Seek Puzzles, and Nonprofit Management. Using an Ionscan 600, Deputy Stoudt field tested various pages from all the books and the tests returned as inconclusive.

30. Upon executing the search warrant on SUBJECT PARCEL 6, on December 22, 2025, case agents discovered the following books: The Holy Qur'an, Large Print Word Seek Puzzles, and Nonprofit Management. The gross weight of the Nonprofit Management was 1030 grams. Using an Ionscan 600, Deputy Stoudt field tested page 207 of the Nonprofit Management book which field tested positive for the presence of heroin.

31. Case agents conducted a search of the Wisconsin DOC jail call system for SMITH. Case agents listened to several of SMITH's jail calls and became accustomed to his voice. Case agents located a call (CSN# 828666817) that occurred on December 14, 2025, at approximately 12:25 p.m., between a female using phone number 414-213-6262 and SMITH. A search of the

CLEAR database showed 414-213-6262 was associated with WHIDBEE. It should be noted, case agents identified SMITH by his voice and not by his phone PIN. SMITH appeared to be making the call using a different inmate's PIN. SMITH used inmate Darrell Davison's ("Davison") PIN to make the call. From their training and experience, case agents know inmates will sometimes use other inmates' phone PINs to have guarded phone conversations with other co-conspirators about illegal activities in an attempt to avoid detection by law enforcement officers.

32. During call 828666817, SMITH was asking how the packaging and printing of shipping labels went the previous night for WHIDBEE. WHIDBEE appeared to confirm all six parcels are ready to be shipped and she successfully created all the shipping labels from an online store. It appeared SMITH was paying WHIDBEE for helping package and ship the drug laden parcels due to WHIDBEE stating she was "hired" by SMITH.

33. Case agents located a call (CSN# 828895571) that occurred on December 14, 2025, at approximately 7:01 p.m., again suspected to be between WHIDBEE using phone number 414-213-6262 and SMITH. It should be noted, case agents identified SMITH by his voice and not by his phone PIN. SMITH was again using inmate Davison's phone PIN to make the call.

34. At the beginning of call 828895571, WHIDBEE confirmed she was enroute to the Milwaukee Main Post Office. At the end of the call, WHIDBEE stated she arrived at the Post Office and SMITH instructed her to go inside and look for the self-service kiosk ("SSK") machine due to the Post Office retail area being closed.

35. Case agents located a call (CSN# 828912671) that occurred on December 14, 2025, at approximately 7:22 p.m., again suspected to be between WHIDBEE using phone number 414-213-6262 and SMITH. It should be noted, case agents identified SMITH by his voice and not by his phone PIN. SMITH used inmate Juan Morales-Escarffullett's phone PIN to make the call.

36. During call 828912671, at approximately 7:26 p.m., WHIDBEE said she sees the front door of the Post Office and SMITH tells her to walk through the front door and again look for the SSK machine. At approximately 7:27 p.m., WHIDBEE confirmed she saw the SSK machine and a place to drop the parcels off. The timing of this statement correlates to what the Milwaukee Main Post Office surveillance video showed (as described below). WHIDBEE later stated she dropped off all six parcels. SMITH said he would need to pay WHIDBEE an additional $200 for a total of $500. WHIDBEE confirmed she already received and spent the $300 sent to her by SMITH.

37. I reviewed the surveillance video from the Milwaukee Main Post Office, which showed a black female, later identified as WHIDBEE, entering the Post Office on December 14, 2025, at approximately 7:27 p.m. WHIDBEE used the SSK machine to ship six parcels. After completing her transaction, WHIDBEE left the Post Office at approximately 7:33 p.m. Case agents located WHIDBEE's suspected Facebook profile (https://www.facebook.com/Dest28). The profile name was "Destany Whidbee", and it showed she was from Milwaukee, Wisconsin. I compared her Wisconsin driver's license photograph and WHIDBEE's Facebook profile pictures to the female shipping the six parcels and identified WHIDBEE as the shipper.

38. SUBJECT PARCELS 1 through 7 had their labels created and postage paid for using a USPS Click-N-Ship ("CNS") account. The user profile for the CNS account showed the following information:

a. User ID Number - 479693470
b. Name – Destany WHIDBEE
c. Company Name – Diamondinroughcommunities
d. Email – destanywhidbee1209@gmail.com

e. Phone Number – 414-213-6262

f. Address – 5102 N. Lovers Lane Rd. Apt. 7, Milwaukee, Wisconsin

**Seizure of SUBJECT PARCELS 1 and 4**

39. On January 5, 2026, I received SUBJECT PARCELS 1 and 4 after they were forwarded to me, unopened, by the various Wisconsin DOC locations. The parcels can be described as follows:

a. USPS Ground Advantage parcel 9434630109355101482343 ("SUBJECT PARCEL 1"). SUBJECT PARCEL 1 was a USPS parcel weighing approximately 4 lbs. 0 oz. The shipping label for SUBJECT PARCEL 1 indicated it was from "DIAMONDINROUGHCOMMUNITIES DESTANY WHIDBEE 5102 N LOVERS LANE RD APT 7 MILWAUKEE WI 53225-3729". The sender listed an email address of "destanywhidbee1209@gmail.com". SUBJECT PARCEL 1 bore a typewritten label addressed to "MELVIN JOHNSON 1101 MORRISON DR BOSCOBEL WI 53805-1180". Records for SUBJECT PARCEL 1 did not show a postmark location. The shipping label was created on December 14, 2025 at approximately 2:00 a.m. The postage was paid through Click-N-Ship and was $5.85. SUBJECT PARCEL 1 was delivered on December 16, 2025 at approximately 8:21 a.m.

b. USPS Ground Advantage parcel 9434630109355101482329 ("SUBJECT PARCEL 4"). SUBJECT PARCEL 4 was a USPS parcel weighing approximately 4 lbs. 0 oz. The shipping label for SUBJECT PARCEL 4 indicated it was from "DIAMONDINROUGHCOMMUNITIES

DESTANY WHIDBEE 5102 N LOVERS LANE RD APT 7 MILWAUKEE WI 53225-3729". SUBJECT PARCEL 4 bore a typewritten label addressed to "WARREN MCNEIL N6500 HAIPEK RD BLACK RIVER FALLS WI 54615-5404". Records for SUBJECT PARCEL 4 did not show a postmark location. The shipping label was created on December 14, 2025 at approximately 1:55 a.m. The postage was paid through Click-N-Ship and was $6.15. SUBJECT PARCEL 4 was delivered on December 19, 2025 at approximately 8:01 a.m.

40. On January 5, 2026, I applied for and received federal search warrants for SUBJECT PARCEL 1 and SUBJECT PARCEL 4. The search warrants were issued by U.S. Magistrate Judge Nancy Joseph in the Eastern District of Wisconsin.

41. Upon executing the search warrant on SUBJECT PARCEL 1, on January 6, 2026, case agents discovered the following books: Large Print Word Puzzles, King James Bible, and a Merriam-Webster's Thesaurus. The pages in Large Print Word Puzzles book appeared to be altered and not the same as if they were produced by the original manufacturer. It appeared as if the pages were dried and wrinkled as if they were previously wet. The pages were also smaller than the outside cover of the book which did not appear normal. The gross weight of the Large Print Word Puzzles book was 235 grams, and the Merriam-Webster's Thesaurus was 360 grams. Using an Ionscan 600, Deputy Stoudt field tested page 43 of the Large Print Word Puzzles book which field tested positive for the presence of Spice-H. Deputy Stoudt also field tested page 314 of the Merriam-Webster's Thesaurus which field tested positive for the presence of cocaine.

42. Upon executing the search warrant on SUBJECT PARCEL 4, on January 6, 2026, case agents discovered the following books: The Only Astrology Book You'll Ever Need,

Crossword Puzzles, and Value Ultra Thinline Bible. The pages in Crossword Puzzle book appeared to be altered and not the same as if they were produced by the original manufacturer. It appeared as if the pages were dried and wrinkled as if they were previously wet. The pages were also smaller than the outside cover of the book which did not appear normal. The gross weight of the Crossword Puzzles book was 230 grams. Using an Ionscan 600, Deputy Stoudt field tested page 43 of the Crossword Puzzles book which field tested positive for the presence of Spice-H.

**K. ROGERS Begins Working for SMITH**

43. A search of the CLEAR database indicated K. ROGERS was linked to 414-249-1107. This phone number was also found to have several jail calls with SMITH in the Wisconsin DOC jail call system.

44. Case agents conducted a search of the Wisconsin DOC jailcall system for K. ROGERS's suspected phone number, 414-249-1107, and located a call (CSN# 838927507) that occurred on January 5, 2026, at approximately 7:35 a.m. The caller had a male's voice with the receiver having a female voice who was believed to be K. ROGERS. During the phone call, the male explained to the K. ROGERS that a call will be made to her with an offer that she needs to carefully consider. The male voice explains that the person making the offer is "hot" and she needs to be cautious. The male then explains how to be cautious on jail phone calls to avoid alerting authorities. He explains certain words to avoid saying. The male and K. ROGERS talked about how the offer coming can help her get her own place and make money.

45. The Wisconsin DOC jail call system showed a follow up call (CSN# 838930681) was made to K. ROGERS's suspected phone number, 414-249-1107, on January 5, 2026, at approximately 7:56 a.m. The recipient of the call was a female's voice, suspected to be K. ROGERS, and the caller appeared to be SMITH. Case agents identified SMITH by his voice and

not by his phone PIN. SMITH appeared to be making the call using a different inmate's PIN. SMITH used inmate Davison's PIN to make the call. During the call, SMITH explained to K. ROGERS that he is going to give her a proposition. He explained that he needed someone he can trust and to be a competent person handling things for him. SMITH told K. ROGERS that he will get her, her own apartment, and will put her on the books so she is receiving money. He explained that he is setting up a non-profit business with a website and that she will be able to receive checks from the non-profit. K. ROGERS advised she was interested and told SMITH that L. ROGERS may be able to assist as well. They discussed involving L. ROGERS in the business. SMITH told K. ROGERS that after she learned from WHIDBEE, he wants all his stuff to be organized. SMITH stated he wants his stuff in one safe location. SMITH told K. ROGERS that he wanted to invest in her and have her run the operation if she is serious about helping. K. ROGERS responded she was interested. SMITH said he uses USPS. He said that she should have packages mailed from the downtown Post Office, which is in the area of 6th Street and W. Saint Paul Avenue. SMITH stated there is a kiosk at this location that can be used.

46. Case agents conducted a search of the Wisconsin DOC jail call system for K. ROGERS's suspected phone number, 414-249-1107, and located a call (CSN# 838987799) that occurred on January 5, 2026, at approximately 11:30 a.m. The call was again placed from Davison's phone pin, but the caller appeared to be SMITH. The recipient was again K. ROGERS. During the call, K. ROGERS sounded like she was with WHIDBEE. The three subjects continued to discuss issues with creating shipping labels and talked about shipping "tomorrow".

47. Case agents conducted a search of the Wisconsin DOC jail call system for K. ROGERS's suspected phone number, 414-249-1107, and located a call (CSN# 839009777) that occurred on January 5, 2026, at approximately 12:33 p.m. The caller's phone PIN was SMITH's

and the caller sounded like SMITH's voice. The recipient was again K. ROGERS. During the call, K. ROGERS was present with WHIDBEE. SMITH asked K. ROGERS, "So what's up man, you took everything with you, I wanted you to organize that shit back there." K. ROGERS responded, "I got em, the books, I got em." SMITH asked, "you took everything with you?" K. ROGERS responded, "yup." Antonio SMITH stated, "okay, everything I need to organize as well", and "the machine and shit with you to?" K. ROGERS responded, "yup, it's just a matter of getting this label printing, I think I'm goanna make my own account." Case agents have heard the term "machine" used by multiple members of this DTO. Case agents believe from this call K. ROGERS is now in possession of the machine, after taking it from WHIDBEE, and this machine is suspected of assisting the DTO in the creation of drug impregnated books. WHIDBEE and SMITH then discussed issues with printing labels. WHIDBEE told SMITH she needed to make her own account with USPS because the problem with the address was with Barnes and Noble. SMITH got upset with WHIDBEE and told her, "you don't need to say everything, I understand what you're saying, you know what I'm saying?" He also stated, "I understand the problem, you can't do shit but set up under your name and still enter in the information that it needs to be done." SMITH also said, "Just say, cause I'm always gonna understand, just say the store, you understand what I'm saying, or that company." WHIDBEE stated, "I got you." From their training and experience, case agents believe SMITH was mad at WHIDBEE for not attempting to talk in code or more abbreviated terms in order to deter law enforcement from figuring out their operation.

**Seizure of SUBJECT PARCELS 8, 9, and 10**

48. On January 6, 2026, at approximately 2:40 p.m., City of Brookfield Police Department Detective Richard Tank began conducting surveillance on K. ROGERS residence, 4053A N. 6th Street ("**SUBJECT PREMISE 1**"). Det. Tank observed a silver Honda Accord

bearing Wisconsin license plate AXX6320 ("**SUBJECT PREMISE 2**") parked on N. 6th Street in front of the **SUBJECT PREMISE 1**. A review of Wisconsin DOT records indicated **SUBJECT PREMISE 2** was registered to L. ROGERS, but the license plates belonged to a different vehicle. At approximately 2:57 p.m., Det. Tank observed two black females, later identified as K. ROGERS and L. ROGERS, walk from the rear of the residence to **SUBJECT PREMISE 2**. Case agents believe both females exited from the rear door of the residence which is believed to be associated with the upper unit of the residence, 4053A N. 6th Street ("**SUBJECT PREMISE 1**"). K. ROGERS was seen carrying a blue and light blue Aldi's reusable shopping bag that appeared full.

49. L. ROGERS sat in the driver's seat and K. ROGERS sat in the front passenger's seat of **SUBJECT PREMISE 2** and **SUBJECT PREMISE 2** then left the area. Det. Tank continued surveillance and followed **SUBJECT PREMISE 2** occupied by K. ROGERS and L. ROGERS. **SUBJECT PREMISE 2** drove directly to the Milwaukee Main Post Office. After parking the vehicle, both females exited **SUBJECT PREMISE 2** and walked into the Post Office. Det. Tank again observed K. ROGERS carrying the blue and light blue Aldi's reusable shopping bag that appeared full.

50. At approximately 3:36 p.m., Det. Tank observed both females exit the Post Office, enter **SUBJECT PREMISE 2** and drive away.

51. On January 6, 2026, case agents conducted a search of the Wisconsin DOC jail call system for SMITH. Case agents located a call (CSN# 839527833) that occurred on January 6, 2025, at approximately 3:17 p.m., between what appeared to be an elderly female voice using phone number 872-357-2884 and SMITH. At the beginning of the call, SMITH stated, "Call Latrese. Call this number ma" and he provided 414-788-0326. After providing the phone number, it appeared the elderly female three-way called 414-788-0326 with SMITH. An additional female

answered the phone call and SMITH called her "Trese". This female was later identified as Latrese ROGERS ("L. ROGERS"). When SMITH asked where she was, L. ROGERS stated "we" are here. SMITH asked L. ROGERS to ask "Krys", later identified to be K. ROGERS, why she was not answering her phone because SMITH said his mother tried calling her multiple times. L. ROGERS then told K. ROGERS that "Rhonda" tired calling her. K. ROGERS then advised SMITH they were at the Post Office. SMITH asked K. ROGERS to verify the address on the package for "WJ". SMITH told K. ROGERS he was asking because "Destany" put the wrong address on the shipping label and the package "came back". Case agents suspect SMITH was referring to SUBJECT PARCEL 7 (as described below) which was addressed to "William Jones" and was not delivered to the recipient because the recipient address did not exist. SUBJECT PARCEL 7 was returned to the sender's address because of this. Case agents suspect SMITH was attempting to use code words when he said "WJ" instead of referring to the entire name. SMITH asked them to verify the shipping addresses to avoid mistakes in the future. K. ROGERS replied the address she used she got "out your momma phone". Case agents believe K. ROGERS utilized Rhonda MEEKS ("MEEKS") cell phone to obtain the correct address. MEEKS is the suspected mother of SMITH.

52. On January 6, 2026, I was reviewing historical USPS business records related to Click-N-Ship account number 479693470, which is the same account registered to WHIDBEE, when the following parcel was determined to be suspicious:

a. USPS Ground Advantage parcel 9434630109355101481735 ("SUBJECT PARCEL 7"). SUBJECT PARCEL 7 was a USPS parcel weighing approximately 3 lbs. 1 oz. The shipping label for SUBJECT PARCEL 7 indicated it was from "DIAMONDINROUGHCOMMUNITIES

DESTANY WHIDBEE 5102 N LOVERS LANE RD APT 7 MILWAUKEE WI 53225-3729". The sender listed an email address of "destanywhidbee1209@gmail.com". SUBJECT PARCEL 7 bore a typewritten label addressed to "WILLIAMS JONES 2835 RIVERSIDE DR GREEN BAY WI 54301". Records for SUBJECT PARCEL 7 did not show a postmark location. The shipping label was created on December 14, 2025 at approximately 1:21 a.m. The postage was paid through Click-N-Ship and was $6.07. SUBJECT PARCEL 7 was not delivered due to the recipient's address being fictious. SUBJECT PARCEL 7 was returned to the sender address on December 26, 2025 at approximately 1:18 p.m

53. On January 6, 2026, I reviewed the surveillance video from the Milwaukee Main Post Office, which showed two black females, later identified as L. ROGERS and K. ROGERS, entering the Post Office on January 6, 2026, at approximately 3:15 p.m. K. ROGERS was carrying a bag filled with multiple parcels.

54. K. ROGERS, while being assisted by L. ROGERS, used the SSK machine to ship two parcels and attempted to pay for the postage for a third. All parcels were white in color and appeared to be bubble mailer envelopes.

55. While utilizing the SSK, L. ROGERS appeared to receive a phone call which correlates to the jail call (CSN# 839527833) documented above. The video showed the females shipped two parcels and were in possession of a third parcel, but they did not ship the third parcel. The third parcel was placed back into K. ROGERS bag. After completing their transactions, both females left the Post Office with the third parcel at approximately 3:36 p.m.

56. At approximately 4:15 p.m., K. ROGERS returned to the Milwaukee Main Post Office with one parcel. K. ROGERS dropped the parcel into the SSK and left the Post Office at approximately 4:16 p.m.

57. Case agents located K. ROGERS's suspected Facebook profile (https://www.facebook.com/krystynajustthirsty.rogersgottagetit). The profile name was "Krystyna Rogers", and it showed she lived in Milwaukee, Wisconsin. Case agents compared the Wisconsin driver's license photograph and K. ROGERS Facebook profile pictures to the female shipping the three parcels and identified K. ROGERS as one of the shippers.

58. Case agents located L. ROGERS's suspected Facebook profile (https://www.facebook.com/zoey.zoey.3557). The profile name was "Rogers S Lartrese (Zona)". Case agents compared the Wisconsin driver's license photograph and L. ROGERS Facebook profile pictures to the female shipping the two parcels and identified K. ROGERS as one of the shippers.

59. On January 6, 2026, at approximately 4:20 p.m., I traveled to the Milwaukee Main Post Office and located the following suspicious parcels which visually appeared similar to the parcels shipped by K. ROGERS and L. ROGERS:

a. USPS Priority Mail parcel 9505506703916006581682 ("SUBJECT PARCEL 8"). SUBJECT PARCEL 8 was a USPS parcel weighing approximately 3 lbs. 5 oz. The shipping label for SUBJECT PARCEL 8 indicated it was from "BARNES NOBEL 2500 N MAYFAIR ROAD MILWAUKEE WI 53226". SUBJECT PARCEL 8 bore a typewritten label addressed to "CHARLES WALKER PO BOX 950 PORTAGE WI 53901-0950". SUBJECT PARCEL 8 was postmarked in Milwaukee, Wisconsin

53203 on January 6, 2026 at approximately 3:24 p.m. The postage paid was $12.95.

b. USPS Priority Mail parcel 9505506703916006581705 ("SUBJECT PARCEL 9"). SUBJECT PARCEL 9 was a USPS parcel weighing approximately 4 lbs. 9 oz. The shipping label for SUBJECT PARCEL 9 indicated it was from "BARNES NOBEL 2500 N MAYFAIR ROAD MILWAUKEE WI 53226". SUBJECT PARCEL 9 bore a typewritten label addressed to "ADRIAN IRBY 2000 PROGRESS DR NEW LISBON WI 53950-1530". SUBJECT PARCEL 9 was postmarked in Milwaukee, Wisconsin 53203 on January 6, 2026 at approximately 3:29 p.m. The postage paid was $13.75.

c. USPS Priority Mail parcel 9505506703966006399657 ("SUBJECT PARCEL 10"). SUBJECT PARCEL 10 was a USPS parcel weighing approximately 3 lbs. 8 oz. The shipping label for SUBJECT PARCEL 10 indicated it was from "BARNES NOBEL 2500 N MAYFAIR ROAD MILWAUKEE WI 53226". SUBJECT PARCEL 10 bore a typewritten label addressed to "WILLIAM JONES PO BOX 19033 GREEN BAY WI 54307-9033". SUBJECT PARCEL 10 was postmarked in Milwaukee, Wisconsin 53202 on January 6, 2026 at approximately 4:01 p.m. The postage paid was $12.95.

60. SUBJECT PARCEL 10 was postmarked at a different location than SUBJECT PARCEL 8 and SUBJECT PARCEL 9. I believe this is the parcel K. ROGERS kept with her and later returned to the Milwaukee Main Post Office and dropped off at the SSK.

61. On January 7, 2026, I applied for and received federal search warrants for SUBJECT PARCELS 8, 9, and 10. The search warrants were issued by U.S. Magistrate Judge Nancy Joseph in the Eastern District of Wisconsin.

62. Upon executing the search warrant on SUBJECT PARCEL 8, on January 7, 2026, case agents discovered the following books: Merriam-Webster's Thesaurus, King James version Holy Bible, and Crossword Puzzles. The pages in the Crossword Puzzles book did not appear to be produced by the original manufacturer. It appeared as if the pages were dried and wrinkled as if they were previously wet and several of the pages had smudges or stains on them. The pages were also smaller than the outside cover of the book which did not appear normal. The gross weight of the Crossword Puzzles book was 240 grams. Using an Ionscan 600, Deputy Stoudt field tested puzzle 77 of the Crossword Puzzle book which field tested positive for the presence of Spice-H.

63. Upon executing the search warrant on SUBJECT PARCEL 9, on January 7, 2026, case agents discovered the following books: The Holy Qur'an, Crossword Puzzles, and The Only Astrology Book You'll Ever Need. The pages in the Crossword Puzzles book did not appear to be produced by the original manufacturer. It appeared as if the pages were dried and wrinkled as if they were previously wet and several of the pages had smudges or stains on them. The pages were also smaller than the outside cover of the book which did not appear normal. The gross weight of the Crossword Puzzles book was 215 grams. Using an Ionscan 600, Deputy Stoudt field tested puzzle 31 of the Crossword Puzzle book which field tested positive for the presence of Spice-H.

64. Upon executing the search warrant on SUBJECT PARCEL 10, on January 7, 2026, case agents discovered the following books: Large-Print Word Seek Puzzles, The Holy Qur'an,

and an Oxford English Dictionary. The pages in the Crossword Puzzles book, which were out of numerical order, did not appear to be produced by the original manufacturer. It appeared as if the pages were dried and wrinkled as if they were previously wet. The pages were also smaller than the outside cover of the book which did not appear normal. The gross weight of the Word Seek Puzzles book was 245 grams. Using an Ionscan 600, Deputy Stoudt field tested page 86 of the Word Seek Puzzles book which field tested positive for the presence of Spice-H.

**Mail Cover for Krystyna ROGERS' Address**

65. On January 8, 2026, I requested and received approval for a standard mail cover for 4053A N. 6th Street, Milwaukee, Wisconsin 53212 ("**SUBJECT PREMISE 1**") between December 10, 2025 to January 8, 2026. A review of the results indicated mail was addressed to multiple different individuals at 4053A N. 6th Street. These included, but were not limited to, K. ROGERS and L. ROGERS. Both of these subjects consistently received First Class and Standard mail at this address between the requested dates of the mail cover.

66. The mail cover results for 4053A N. 6th Street also included results for 4053 N. 6th Street. None of the mail delivered to 4053 N. 6th Street was addressed to anyone with the last name of Rogers.

67. Based on the foregoing, I respectfully request that this Court issue a search warrant for the **SUBJECT PREMISES** described in Attachments A authorizing the seizure and search of the items described in Attachment B.

## I. COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

68. As described above and in Attachment B, this application seeks permission to search for records that might be found on, in, or at the **SUBJECT PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard

drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

69. *Probable cause.* I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

70. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a

computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime.

From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

71. *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a property for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the **SUBJECT PREMISES**, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on the **SUBJECT PREMISES** could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the **SUBJECT PREMISES**. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

72. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

73. Because multiple people may share the **SUBJECT PREMISES** as a residence, it is possible that the **SUBJECT PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## II. <u>BIOMETRIC ACCESS TO DEVICES</u>

74. This warrant permits law enforcement to compel residents of the **SUBJECT PREMISES** to unlock any devices requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition

features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID. Apple also offers a feature called "Face ID," which allow a user to register multiple faces that can unlock a device, by displaying that face to the device's camera.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f. As discussed in this affidavit, I believe one or more digital devices will be found during the search. The passcode or password that would unlock the devices

subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

75. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**'s to the fingerprint scanner of the devices; (2) hold the devices found in front of the face of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**'s and activate the facial recognition feature; and/or (3) hold the devices found in front of the face of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**'s and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**'s state or otherwise provide the password or any other means that may be used to

unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**'s to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

Based on the foregoing, I respectfully request that this Court issue a search warrant for the locations described in Attachment A authorizing the seizure and search of the items described in Attachment B.

## ATTACHMENT A1

**Property to be searched**

The property to be searched is the premises located at **4053A N. 6th Street Upper, Milwaukee, Wisconsin** ("**SUBJECT PREMISE 1**"), a multi-family residence with tan siding and white trim, and a light brown roof. The numbers "4053A" are fixed to the east side of the southeast porch column on the front porch. The front door of the residence faces east. The search to include all associated common spaces, basement, garage, outbuildings, and electronic devices.





# ATTACHMENT A2

**Property to be searched**

The property to be searched is a silver Honda Accord bearing Wisconsin license plates AZZ6320 **("SUBJECT PREMISE 2").**





## ATTACHMENT B

**Property to be Seized**

1. Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances;

2. In particular, any machine, equipment or tools used to manufacture or bind books, or to impregnate books with controlled substances in any manner including dissolving the controlled substances and/or coating, painting or soaking book pages;

3. Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

4. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, cryptocurrency, jewelry, or other items obtained with the proceeds from drug trafficking activities;

5. Records and information relating to the purchase, sale, shipment, handling, importation, or distribution of cocaine and fentanyl, and any other controlled substance, including but not limited to bills, invoices, receipts, shipping documents, purchase orders, letters, notes, and order forms, lists of contacts and any identifying information; photographs, videos, or other media storage connected to controlled substances; types, amounts, and prices of controlled substances purchased/sold; any information related to sources or purchasers of controlled substances (including names, addresses, phone numbers, or any other identifying information);

6. Firearms, ammunition, cases, or firearm accessories and documents showing firearm possession or ownership, to include but not limited to CCW permit and firearm purchase/acquisition documents;

7. Indicia of unlawful possession, use, or distribution of controlled substances, including but not limited to paraphernalia and evidence known to be associated with drug trafficking and/or drug possession;

8. USPS packaging materials, or other documents and items related to shipping or mailing;

9. Evidence of recent cash expenditures;

10. Bank account records, loan documents, wire transfer records, money order receipts, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

11. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

12. Identification and location of assets obtained with drug proceeds;

13. All records, items, and documents reflecting travel for the purpose of participating in the aforementioned drug trafficking organization, including but not limited passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and

restaurant receipts, canceled checks, maps, gas station receipts, store receipts, credit card receipts, restaurant receipts, maps, and records of long distance calls reflecting travel;

14. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

15. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

16. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances;

17. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

18. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

19. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

20. All records and information relating to violations of Title 21, United States Code, Sections 841(a)(1) (manufacture, distribution, and possession with intent to distribute a controlled substance), 846 (conspiracy to manufacture, distribute, and possess with intent to distribute a controlled substance), and 843(b) (unlawful use of a communication facility, including the mails,

to facilitate the distribution of a controlled substance), involving Antonio SMITH, Destany WHIDBEE, Krystyna ROGERS, Latrese ROGERS, and others, known or unknown, including but not limited to:

a. Records and information relating to the existence, scope, overt acts, and members of a drug conspiracy.

b. Records and information relating to the possession, custody, or control of the relevant electronic devices and accounts, including accounts with electronic communication service provides and remote computing services; and

c. Records and information relating to the use of the U.S. Postal Service or other parcel, mailing, shipping, or delivery services;

d. Records and information relating to the identity or location of the suspects;

e. Records and information relating to Internet Protocol addresses;

f. Evidence showing custody, control, ownership, or possession of SUBJECT PREMISE 1 or SUBJECT PREMISE 2

For any computer, cell phone, tablet, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, for purposes of this Attachment B, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

n. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "COMPUTER" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or

storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term “storage medium” includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of the subject premises described in Attachment A (Attachment A1 or A2), law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**’s to the fingerprint scanner of the devices; (2) hold the devices found in front of the face of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**’s and activate the facial recognition feature; and/or (3) hold the devices found in front of the face of the targets of the investigation, specifically K. ROGERS and L. ROGERS, at the **SUBJECT PREMISES**’s and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.